**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| RICHARD DELMAN, derivatively on behalf of AEROVIRONMENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WAHID NAWABI, KEVIN P. MCDONNELL, MARY CLUM, CHARLES THOMAS BURBAGE, PHILIP S. DAVIDSON, CINDY K. LEWIS, MARY BETH LONG, EDWARD R. MULLER, STEPHEN F. PAGE, JOSEPH L. VOTEL, DAVID WODLINGER, AND HENRY H. ALBERS,<br><br>Defendants,<br><br>and<br><br>AEROVIRONMENT, INC.<br><br>Nominal Defendant, | Case No. 1:26-cv-3050<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Richard Delman ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint (the "Complaint") behalf of nominal defendant AeroVironment, Inc. ("AeroVironment" or the "Company"), against the Individual Defendants (defined herein, and together with AeroVironment, the "Defendants") for breaches of fiduciary duties as directors and/or officers of AeroVironment, unjust enrichment, waste of corporate assets, and for violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, as well as for contribution under Sections 10(b)

and 21D of the Exchange Act.

Plaintiff's allegations are based upon a review of publicly available information, including filings by AeroVironment with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. As a direct and proximate result of the Individual Defendants' misconduct, the Company has been damaged. Plaintiff seeks to remedy those damages by this complaint.

## INTRODUCTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendants AeroVironment against the Individual Defendants, who are certain current and former members of the Company's Board of Directors (the "Board") and senior management team. This derivative action arises from breaches of their fiduciary duties of loyalty, candor, and good faith and other violations of law, in connection with the Individual Defendants causing, approving, and/or acquiescing in the Company's issuance of false and misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects between June 2025 and March 2026 (the "Relevant Period").

2. AeroVironment, a Delaware corporation headquartered in Arlington, Virginia, operates as a defense technology provider delivering integrated capabilities across air, land, sea, space, and cyber.

3. On May 1, 2025, AeroVironment announced it had completed the acquisition of BlueHalo, LLC ("BlueHalo"), a defense technology firm specializing in advanced engineering products, in an all-stock transaction with an enterprise value of approximately $4.1 billion.

4. Three years earlier, BlueHalo had been awarded a $1.4 billion contract to deliver BADGER phased array antenna systems (a type of advanced ground-terminal system used to track satellites), to support the U.S. Space Force's Satellite Communication Augmentation Resource ("SCAR") program. The BADGER would be a bespoke product designed for the U.S. Space Force, according to its specifications. This contract value subsequently increased to $1.7 billion.

5. The SCAR program represents the U.S. Space Force's efforts to modernize antennas used by the Satellite Control Network ("SCN"), which is comprised of 19 fixed antennas across the world and executes tasks such as tracking satellites, transmitting signals, and conducting telemetry, or accessing data from satellites to assess their status and health.

6. In an April 2023 report, the U.S. Government Accountability Office described the SCN as "aging and difficult to maintain." The U.S. Space Force has described the purpose of the SCAR program as modernizing the aging SCN by introducing phased array antennas to the network that boast newer capabilities, such as the ability to communicate with more than one satellite simultaneously.

7. During the Relevant Period, the Individual Defendants consistently assured stockholders that the SCAR program would drive revenue growth for AeroVironment moving forward. Among other items, the Individual Defendants stated that the SCAR program represented a "tremendous growth opportunity," that AeroVironment's work pursuant to the contract was "very much on track," that the customer was "asking for more [BADGER systems]," and that the Company stood "ready to build more."

8. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to

disclose that: (i) they understated the likelihood that the Company would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN; (ii) accordingly, the Individual Defendants overstated AeroVironment's business and financial prospects; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

9. On January 20, 2026, the Individual Defendants announced that the U.S. government had issued a stop work order on the Company's agreement to deliver BADGER systems to the SCAR program. In the same announcement, the Individual Defendants represented that the stop work order "allows for the parties to negotiate an amended agreement for the future of the SCAR program" and that "[t]he Company expects to continue to deliver capabilities and products for the SCAR program."

10. On this news, AeroVironment's stock price fell $61.97 per share, or nearly 16%, to close at $330.89 per share on January 20, 2026.

11. Then, on March 2, 2026, *Space News* reported that the U.S. Space Force was reopening the SCAR program and "reassessing how to move forward." *Space News* quoted Colonel Owen Stevens ("Colonel Stevens"), the director of contracting at the Space Rapid Capabilities Office, which supervised SCAR, as stating, "We have been in conversations with the [senior acquisition executive] ***for a little while now***, and we are going to move into a new acquisition strategy for SCAR."

12. On this news, AeroVironment's stock price fell $43.93 per share, or nearly 17.5%, to close at $208.32 per share on March 2, 2026.

13. Then, on March 10, 2026, the Individual Defendants caused AeroVironment to

announce its financial results for the third quarter of fiscal year 2026. Among other items, these results included a third-quarter operating loss of $179.0 million, compared to an operating loss of $3.1 million for the same period in fiscal year 2025. These financial results reflected the impact of a $151.3 million goodwill impairment in the Company's space division after the stop work order on the Company's BADGER systems built for the SCAR program. The Individual Defendants also reported that the U.S. Space Force had terminated the Company's contract concerning the SCAR program, and as a result, it would have to "***recompete***" for the SCAR program.

14. On this news, AeroVironment's stock price fell $13.84 per share, or more than 6%, to close at $207.73 per share on March 11, 2026.

15. On March 31, 2026, the U.S. Space Force announced its decision to diversify suppliers and rely on less costly commercial, off-the-shelf solutions in connection with its work to upgrade the SCN, instead of pursuing another single-vendor bespoke solution.

16. Finally, on June 22, 2026, the Individual Defendants caused the Company to announce that its previously issued quarterly report from March 11, 2026 required restatement and "should no longer be relied upon" because its goodwill impairment calculation was understated by ***$89.4 million***. Notably, the error in the calculation resulted from a "newly identified ***material weakness in the Company's internal control over financial reporting***," and thus AeroVironment's "disclosure controls and procedures as of January 31, 2026 were ***ineffective***."

17. On this news, the price of the Company's stock fell $18.28 per share, or nearly 11%, from a closing price of $169.61 on June 18, 2026, to close at $151.33 per share on June 22, 2026.

18. Meanwhile, before the truth emerged and the Company's stock price plummeted, three of the Individual Defendants named herein breached their fiduciary duties by engaging in

lucrative insider sales of Company common stock while the price of the stock was artificially inflated, for combined proceeds of approximately ***$6.8 million***.

19. Due to the Individual Defendants' serious misconduct—which has subjected the Company and certain of the Individual Defendants to, among other things, a federal securities fraud class action lawsuit, captioned *Norrell v. AeroVironment, Inc., et al.,* Case No. 1:26-cv-01429 (E.D. Va.) (the "Securities Action"), a restatement, the need to implement adequate internal controls, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. Due to the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## <u>JURISDICTION AND VENUE</u>

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

18. Plaintiff is a current holder of AeroVironment common stock and has continuously held AeroVironment common stock since 2015.

**Nominal Defendant**

20. Nominal defendant AeroVironment is a Delaware corporation headquartered in Arlington, Virginia. The common stock of AeroVironment is publicly traded on the Nasdaq exchange under the ticker symbol "AVAV."

**The Individual Defendants**

21. Defendant Wahid Nawabi ("Nawabi") joined the Company in 2011 and has served as the Company's President and Chief Executive Officer ("CEO") and as a member of the Board since 2016. In addition, defendant Nawabi currently serves as Chairman of the Board. Defendant Nawabi is a named individual defendant in the Securities Action.

22. Defendant Kevin P. McDonnell ("McDonnell") served as the Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of AeroVironment from 2020 until April 30, 2026. Thereafter, defendant McDonnell served the Company as an "advisor" through July 2026. Defendant McDonnell is a named individual defendant in the Securities Action.

23. Defendant Mary Clum ("Clum") has served as the Company's President of Space, Cyber & Directed Energy since October 2025. Defendant Clum is named as an individual defendant in the Securities Action.

24. Defendant Charles Thomas Burbage ("Burbage") has served as a director of AeroVironment since 2013.

25. Defendant Philip S. Davidson ("Davidson") has served as a director of the Company since June 2023. Defendant Davidson also served during the Relevant Period, and continues to serve, as a member of the Board's Audit Committee (the "Audit Committee").

26. Defendant Cindy K. Lewis ("Lewis") has served as a Company director since 2021. Defendant Lewis also served during the Relevant Period, and continues to serve, as a member of the Audit Committee.

27. Defendant Mary Beth Long ("Long") has served as a director of the Company since August 2023.

28. Defendant Edward R. Muller ("Muller") has served as a director of the Company

since 2013. Defendant Muller also served during the Relevant Period, and continues to serve, as Chairman of the Audit Committee.

29. Defendant Stephen F. Page ("Page") has served as a director of the Company since 2013. Defendant Page also served during the Relevant Period, and continues to serve, as a member of the Audit Committee.

30. Defendant Joseph L. Votel ("Votel") has served as a director of the Company since November 2023.

31. Defendant David Wodlinger ("Wodlinger") served as a director of the Company from May 2025 until he resigned, effective June 17, 2026.

32. Defendant Henry H. Albers ("Albers") served as a director of the Company from May 2025 until he resigned, effective June 17, 2026.

33. Defendants Nawabi, McDonnell, Clum, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, Wodlinger, and Albers are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34. Each Individual Defendant, by virtue of his/her position as a director and/or officer, owed to AeroVironment and to its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage AeroVironment in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AeroVironment and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to AeroVironment and its shareholders the fiduciary

duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AeroVironment, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with AeroVironment, each of the Individual Defendants had knowledge of material non-public information regarding the Company. To discharge their duties, the officers and directors of AeroVironment were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of AeroVironment were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

36. To discharge their duties, the officers and directors of AeroVironment were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AeroVironment were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how AeroVironment conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of AeroVironment and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AeroVironment's operations would comply with all applicable laws and AeroVironment's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

37. Each of the Individual Defendants further owed to AeroVironment and the shareholders the duty of loyalty requiring that each favor AeroVironment's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

38. At all times relevant hereto, the Individual Defendants were the agents of each other and of AeroVironment and were at all times acting within the course and scope of such agency.

39. Because of their advisory, executive, managerial, directorial, and controlling

positions with AeroVironment, each of the Individual Defendants had access to adverse, non-public information about the Company.

40. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AeroVironment.

41. AeroVironment's Code of Ethics states that it "applies to all officers, employees, and members of the boards of directors" of the Company and its subsidiaries. The Company's Code of Ethics also notes that it provides "guidelines for conducting the business of the Company consistent with the highest standards of business ethics."

42. The Code of Ethics provides, in relevant part regarding "Securities Trading":

> The United States securities laws contain very strict prohibitions against trading in securities of publicly-held companies on the basis of material nonpublic information or while securities offerings are in process. These laws place the responsibility on the Company's officers, directors and employees to ensure that nonpublic information about the Company is not used unlawfully in the purchase and sale of securities. Consistent with the Company's Insider Trading Policy, which is available to all employees and directors, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material, nonpublic information about the Company. Therefore, if you have material, nonpublic information regarding the Company, neither you nor any member of your immediate family or a person living in your household may buy or sell securities of the Company or engage in any other action to take advantage of, or pass on to others, that information. This policy also applies to trading in securities of any other company, including suppliers and competitors, about which you have material, nonpublic information which is obtained in the course of your employment with the Company. If you are uncertain about any securities transaction, the Legal Department can assist you.

43. The Code of Ethics further provides, in relevant part regarding "Accuracy of Financial Reports", that "The Company is committed to full and accurate financial disclosure and to maintaining its books and records in compliance with all applicable laws, rules and regulations." The Code of Ethics additionally states in this regard that "The Company's senior financial officers

and other employees working in the Company's accounting function have a special responsibility to ensure that all our financial disclosures are full, fair, accurate, timely and understandable."

44. In a section titled "Compliance with Laws and Regulations," the Code of Ethics states the following:

> Each employee must comply with the laws of the cities, states and countries in which the Company operates. We will not tolerate any activity that violates any laws, rules or regulations applicable to the Company. This includes, without limitation, laws covering commercial bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, unauthorized public communications concerning the Company, illegal political contributions, antitrust prohibitions, export control and sanctions, human rights (including modern slavery), foreign corrupt practices, offering or receiving gratuities, environmental laws, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

45. The Company also maintains an Audit Committee Charter. The Audit Committee Charter states that the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company on behalf of the Board and to report the results of its activities to the Board." Further, in a section titled "Purpose," the Audit Committee Charter states, in relevant part:

> Notwithstanding the foregoing, the Committee's responsibilities are limited to oversight. Management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements as well as the Company's financial reporting process, accounting policies, internal audit function, internal accounting controls and disclosure controls and procedures. The independent auditor is responsible for performing an audit of the Company's annual financial statements and its internal control over financial reporting, expressing an opinion as to the conformity of such annual financial statements with generally accepted accounting principles and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements (when requested to do so by the management of the Company). It is not the responsibility of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosure are complete and accurate or prepared in accordance with generally accepted accounting principles and applicable laws, rules and regulations or to determine the effectiveness of the

Company's internal control over financial reporting. Each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's internal auditor, if any (or others responsible for the internal audit function, including contracted non-employee or audit or accounting firms engaged to provide internal audit services) (the "internal auditor") and the Company's independent auditor) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

46. The Audit Committee's specific responsibilities, per the Audit Committee Charter, include the following:

- "Discuss[ing] with management its process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act";

- Reviewing management's annual assessment of the effectiveness of the Company's internal control over financial reporting and the independent auditor's related report;

- Discussing with management and the independent auditor any material weaknesses or significant deficiencies in the Company's internal controls;

- Reviewing management's plans to remediate identified control deficiencies;

- Determining whether the Company's disclosures concerning material weaknesses and remediation efforts are clear and complete;

- Discussing management's process for completing the quarterly certifications required by Section 302 of the Sarbanes-Oxley Act, including the Chief Executive Officer's and Chief Financial Officer's evaluation of the effectiveness of the Company's disclosure controls; and

- Reviewing changes in internal control over financial reporting that materially affected, or were reasonably likely to materially affect, the Company's internal controls and were required to be disclosed in the Company's SEC filings.

## **SUBSTANTIVE ALLEGATIONS**

### ***Background***

47. AeroVironment, a Delaware corporation headquartered in Arlington, Virginia,

operates as a defense technology provider delivering integrated capabilities across air, land, sea, space, and cyber.

48. On May 1, 2025, AeroVironment announced it had completed the acquisition of BlueHalo, a defense technology firm specializing in advanced engineering products, in an all-stock transaction with an enterprise value of approximately $4.1 billion.

***The Individual Defendants' False and Misleading Statements***

49. As set forth in this section below, during the Relevant Period, the Individual Defendants issued a series of materially false and misleading statements in which they failed to disclose that: (i) AeroVironment understated the likelihood that it would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN; (ii) accordingly, the Individual Defendants overstated AeroVironment's business and financial prospects; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

50. On June 24, 2025, the Individual Defendants caused AeroVironment to issued a press release announcing the Company's financial and operating results for the fiscal fourth quarter and year ended April 30, 2025. This press release included an outlook for the then-upcoming fiscal year, stating in relevant part:

> ***For fiscal year 2026*** inclusive of the projected results of the BlueHalo acquisition, which closed May 1, 2025, ***the Company expects revenue of between $1.9 billion and $2.0 billion***, non-GAAP adjusted EBITDA of between $300 million and $320 million, ***and non-GAAP earnings per diluted share***, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, ***of between $2.80 and $3.00***.

51. On August 13, 2025, the Individual Defendants caused the Company to file an Annual Proxy Statement (the "2025 Proxy Statement") with the SEC and disseminate the 2025

Proxy Statement to stockholders. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

52. The 2025 Proxy Statement called for the Company's stockholders to vote to, *inter alia*: (1) re-elect defendants Muller, Burbage, Wodlinger, and Albers as Class I directors for a one-year term expiring at the 2026 Annual Meeting of Stockholders; (2) ratify the appointment of Deloitte & Touche LLP ("Deloitte") as the Company's independent registered public accounting firm for fiscal year 2026 ("FY 2026"); (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Company's Amended and Restated 2021 Equity Incentive Plan (the "Restated 2021 Plan").

53. The 2025 Proxy Statement noted that if AeroVironment stockholders voted to approve the Restated 2021 Plan, it would become effective immediately. Additionally, the 2025 Proxy Statement stated that, if approved, the Restated 2021 Plan would cause an additional 1,200,000 shares of the Company's common stock to be made available for issuance. Per the 2025 Proxy Statement, as of July 22, 2025, there were 621,582 shares still available for grant under the 2021 Equity Incentive Plan (the "2021 Plan"), meaning that if the Restated 2021 Plan was approved, there would be a total of 1,821,582 shares available for grant. The 2025 Proxy Statement stated that employees, consultants, directors, and employees and consultants of the Company's subsidiaries are eligible to participate in the Restated 2021 Plan. It further noted that if the Restated 2021 Plan was not approved, the existing 2021 Plan would "continue in full force and effect" and the Company "may continue to grant awards under the [2021] Plan . . . using the shares available for issuance thereunder."

54. Regarding the "Board Leadership Structure," the 2025 Proxy Statement stated:

We do not have a formal policy regarding the separation of the roles of Chairman of the Board and Chief Executive Officer. The company's governance framework provides the board with flexibility to select the appropriate leadership structure for long-term success of the company. In making leadership structure determinations, including whether to separate or combine the Chairman of the Board and Chief Executive Officer roles, the board considers many factors, including the specific needs of the business and what is in the best interests of the company's stockholders.

Our current leadership structure is as follows:

- Chairman of the Board, President and Chief Executive Officer: Wahid Nawabi

- Lead Independent Director: Edward R. Muller

- Committees led by independent directors

- Active engagement by all directors

The board believes that this leadership structure, consisting of a combined Chairman of the Board and Chief Executive Officer, an independent director serving as Lead Independent Director and strong, active independent directors, is the optimal structure to guide our company and maintain the focus required to achieve our business goals. The board believes this structure provides an effective balance between strong company leadership and appropriate safeguards and oversight by independent directors. It provides a single leader who is understood by our employees, customers, business partners, and stockholders as providing strong leadership for the company, which enhances our ability and agility to manage resources and provides the focus required to implement our complex business strategy.

55. Regarding the "Board's Role in Risk Oversight," the 2025 Proxy Statement stated:

Our board of directors is responsible for overseeing our risk management and delegates many of these functions to the Audit and Cybersecurity Committees, which report regularly to the board. Under its charter, the Audit Committee is responsible for discussing with management the company's policies with respect to risk assessment and risk management. The committee is chartered to discuss with management our significant risk exposures and the actions management has taken to limit, monitor or control such exposures. Under its charter, the Cybersecurity Committee is responsible for reviewing, discussing, and making recommendations to the full board of directors regarding cybersecurity matters, including cyber risks.

In addition to the Audit and Cybersecurity Committees' work in overseeing risk management, our full board engages in discussions of the most significant risks that

we face and how these risks are being managed. Our Compensation and Nominating and Corporate Governance Committees are also involved in evaluating risks that fall within the purview of those committees' responsibilities.

56. Regarding the Company's Code of Ethics, the 2025 Proxy Statement stated:

Our Amended & Restated Code of Business Conduct and Ethics ("code of conduct"), is our code of ethics for directors, executive officers, employees and agents. Any amendment to the code of conduct that applies to our directors or executive officers may be made only by the board or a board committee and will be disclosed on our website.

The code of conduct is available at http://investor.avinc.com. The Audit Committee charter and the code of conduct are also available in print to any stockholder who requests them.

57. Regarding the Audit Committee, the 2025 Proxy Statement stated that the Audit Committee is responsible for the following:

- selecting and hiring our independent registered public accounting firm;

- evaluating the qualifications, independence and performance of our independent registered public accounting firm;

- reviewing and approving the audit and non-audit services to be performed by our independent registered public accounting firm;

- reviewing the design, adequacy, implementation and effectiveness of our internal controls established for finance, accounting, legal compliance and ethics;

- reviewing the design, adequacy, implementation and effectiveness of our critical accounting and financial policies;

- overseeing and monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters;

- reviewing with management and our independent registered public accounting firm our annual and quarterly financial statements;

- reviewing with management and our independent registered public accounting firm any earnings announcements or other public announcements concerning our operating results; establishing procedures for the receipt, retention and treatment of complaints (including procedures for receiving and handling complaints on a confidential and anonymous basis) regarding accounting, internal

accounting controls or auditing matters, including employee concerns regarding questionable accounting or auditing matters;

- preparing the audit committee report that the SEC requires in our annual proxy statements; and

- reviewing and approving any related party transactions.

58. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated.

59. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

60. As a result of defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger causing the 2025 Proxy Statement to be false and misleading, the Company's stockholders voted, *inter alia*, to: (1) re-elect defendants Muller, Burbage, Wodlinger, and Albers as Class I directors for a one-year term expiring at the 2026 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for FY 2026; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Restated 2021 Plan.

61. As a result of stockholders approving the Restated 2021 Plan, the plan took effective immediately upon reaching stockholder approval on September 25, 2025. An additional 1,200,000 shares were made available for grant, meaning there were 1,821,582 shares available for issuance under the Restated 2021 Plan. The Individual Defendants, most of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and stockholders approving the Restated 2021 Plan. Moreover, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Restated 2021 Plan in the future.

62. On September 9, 2025, the Individual Defendants caused the Company to issue a press release announcing its financial results for the fiscal quarter ended August 2, 2025 (the "Q1 Earnings Release"). Among other representations, the Q1 Earnings Release provided stockholders with updated guidance for the full fiscal year 2026, which included the same outlook as to revenue and an improved outlook as to non-GAAP earnings per share, stating *inter alia*:

> ***For fiscal year 2026, the Company continues to expect revenue of between $1.9 billion and $2.0 billion***, net loss of between $(77) million and $(72) million, non-GAAP adjusted EBITDA of between $300 million and $320 million, loss per diluted share of between $(1.63) and $(1.53) ***and non-GAAP earnings per diluted share***, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, ***of between $3.60 and $3.70***.

63. Also on September 9, 2025, during AeroVironment's conference call to discuss the financial results announced in the Q1 Earnings Release (the "Q1 Earnings Call"). defendant Nawabi conveyed that the BADGER systems, the product at issue in the SCAR contract, "will be [a] key growth driver[] . . . in the future", stating *inter alia*:

> Now on to our second segment, Space, Cyber and Directed Energy, or SCDE segment. Our SCDE segment posted first-quarter revenues of $169 million. Our Space Technologies and directed energy solutions will continue to drive growth in this segment and for the company. As I mentioned earlier, we announced yesterday a $240 million contract award for our long-haul space laser communication system. In addition to anticipated revenue growth from this area, ***we're confident that our BADGER phased array solution and our Counter-UAS directed energy solutions, LOCUST, will be key growth drivers for this segment in the future***.

64. Later during the Q1 Earnings Call, defendant McDonnell conveyed the Individual Defendants' confidence concerning AeroVironment's financial performance moving forward, specifically as to gross margins, stating *inter alia*:

> First year — first quarter adjusted gross margins were 29% versus 45% in the first quarter of FY '25. As noted, the business landscape of the combined new company has changed significantly with a higher service mix and several products in early stages of maturation. We believe adjusted gross margins should continue to improve throughout the year, ending up in the mid-30s by Q4 with an average for the year in the low 30s.

65. Later during the Q1 Earnings Call, in response to an analyst's question concerning the full 2026 fiscal year guidance of $1.9 to 2.0 billion and the potential for upside to that guidance, defendant Nawabi stated that the Individual Defendants "feel very strong about our current guidance," stating *inter alia*:

> There's only so much planning and at risk that we can go given the situation that we're in right now. So for that reason, ***I would say we feel very strong about our current guidance***. Some of that OBD dollars is baked into our guidance and our expectations, but some of it's not. And then every day that goes by, by the budgets not being approved or a continuing resolution going forward or the dollars not hitting their accounts, it could actually — it actually adds more risk for that not to happen this year, but it will happen the following year. ***Regardless, we're going to have a great year***, and we're going to most likely going to finish the year strong with a very strong pipeline in bookings that can set us up for even more success beyond fiscal '26.

66. On September 30, 2025, the Individual Defendants caused AeroVironment to hold its Investor Open House. Among other representations, defendant Nawabi communicated to stockholders the importance of SCAR and the BADGER product that AeroVironment would

purportedly deliver to the U.S. Space Force, claiming that it is "a $1 billion franchise," stating *inter alia*:

> One of our very old investor — old many long-term investors asked me a question last night. It was a very good question actually. It's a question that I asked myself a lot. And it was 'Wahid, what are you most excited about?' So this is all great and I'll give you the top 10 list. . . . ***SCAR and our BADGER space comms is really key. That's a $1 billion franchise***.

67. Also during the Investor Open House, defendant Clum touted AeroVironment's close communication with the U.S. Space Force as the Company's "entire team" was "shoulder-to-shoulder" with the agency, and represented both that the U.S. Space Force was "asking for more" products from AeroVironment and that the Company stood ready to "build more" in response, stating *inter alia*:

> So let's start with our first technology you're going to see in Albuquerque, our BADGER. Here's an example of BADGER right here. We're going to highlight aprogram win. That's the Satellite Control Augmentation Resource program, or SCAR. It's an awarded value of $1.7 billion, extending all the way through '23 — 2030. ***But what set us apart — it's what Wahid he told you. It was not size. It's the way we work. We put our entire team shoulder to shoulder with the customer. We listen, we adapt and we designed with them. So SCAR's a program locked in, in a very high barrier to entry market. [B]ut our team did it. And what's our customer saying, I'm going to quote him***. And I want to pause on this a little bit because it emphasizes that demand and urgency that the [S]pace [F]orce has. So in June of 2025, Breaking defense quoted Dr. Kelly Hammett, he's the Director of the Space Force Rapid Capabilities Office. He said, and I'm going to read his quote. ***We're going to need a bunch of SCARs, and we're going to need them fast as we can make them***. . . . ***We're ready to scale***. You're going to see this. Our whole facility is outfitted with full test automation and the manufacturing is underway in the first deliveries this year. ***So the customer is asking for more. We're ready to build more***. But rather than making me describe it, let's see BADGER in action.

68. On December 3, 2025, defendant Nawabi appeared on behalf of AeroVironment at Goldman Sachs' Industrial and Materials Conference, where he represented that SCAR and the Company's BADGER system would be "major contributors to growth," just three months before stockholders would learn that AeroVironment's work for SCAR was under review, stating *inter*

*alia*:

> Our strategy fundamentally is we're going after very large categories that we can disrupt and be the leader and innovate and have high growth and high value creation. . . . Each one of these opportunities is $1 billion, slightly less than $1 billion or a couple of plus billion dollars large. . . . ***In some cases, we're the only player. Like SCAR, as Kevin mentioned, we've been already selected***. So which one is going to happen when is incredibly difficult to predict in terms of timing. That's the fundamental reason why we don't provide that level of granularity because it is really difficult to be able to time that from the customers' behavior and processes. . . . Now having said that, these are -- ***there are certain areas that I can very confidently think that over the next several years, it's going to be major contributors to growth*** . . . . So the best way to look at it is, you can decide which one you think is going to happen, but I can give you a basket of things that's going to contribute to the growth. . . . ***The other area is SCAR and BADGER. That's a program that we've won. It's $1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays***.

69. On December 9, 2025, the Individual Defendants caused AeroVironment to file with the SEC a Current Report on Form 8-K announcing the Company's financial results for the second quarter of the 2026 fiscal year and held a conference call to discuss the same (the "Q2 Earnings Call"). During that call, defendant Nawabi continued to represent that the SCAR program represented a "tremendous growth opportunity," giving no indication that the program might be under review or that AeroVironment might mutually agree to a stop work order in the following month, stating *inter alia*:

> [AeroVironment] won several key awards in our Space, Cyber and Directed Energy segment with critical new contracts in Laser Communications, Space-related Satellite Communications and Directed Energy. . . . ***[AeroVironment] secured a new firm fixed price option for 2 BADGER phased array systems under the SCAR or Satellite Communication Augmentation Resource program. This program represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production***.

70. Also during the Q2 Earnings Call, defendant McDonnell similarly touted a "significant" contract for "2 BADGERs for the U.S. Space Force," stating *inter alia*:

> The space and directed energy products grew more than 20% in the quarter versus the prior year, with the LOCUST Directed Energy Counter-UAS growth being one of the key drivers. ***As Wahid mentioned earlier, this segment also received several large contracts this past quarter to include a significant contract for our long-haul laser communications and 2 BADGERS for the U.S. Space Force's SCAR program***.

71. Later during the Q2 Earnings Call, in response to an analyst's question concerning this contract and the Individual Defendants' view as to "the expected ramp" for the SCAR program, defendant Nawabi represented that AeroVironment's work for the program was "very much on track," that AeroVironment was making progress "shifting now from development activity to delivering products," and conveyed the Individual Defendants' expectation that "the margins and revenue of that business" would "improve" both in the 2026 fiscal year and "beyond," stating *inter alia*:

> [A]s I mentioned in my remarks, we did secure an additional task order and award from the U.S. Space Force for additional BADGERS — 2 more additional BADGERS. The whole SCAR program, as we mentioned in our comments before, has been so far in a customer-funded development process. ***We're shifting now from development activity to delivering products***, most of which is going to end up eventually going into our firm fixed price contracts. ***That transition not only ramps up the revenue for the second half of the year, but also improves the margin profile of that business. So we're very much on track with our plans***. We're pleased with the performance so far, and ***we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year***.

72. Also during the Q2 Earnings Call, in response to an analyst's question concerning the guidance issued for the Company's 2026 fiscal year, defendant Nawabi affirmed that the Individual Defendants remained "confident," and tied this position to expected contracts and awards from sources including the SCAR program "in the second half of the year," stating *inter alia*:

> [W]e are expecting and we're expecting multiple task orders and orders on the second half that we believe we're going to be able to convert that to revenue. In order for us to overperform is going to be more difficult because of the timing, how

> long it takes to go build those products, get them tested and accepted by the customer and then deliver to our customers. ***So we're confident about our full year guidance, number one. Number two, we do expect contract awards and task orders in the second half that will convert to revenue and that's part of our forecast, and we're confident that we can achieve that. . . . [I]t's a very nice, nice portfolio or basket of contracts and awards that we expect***. It's basically the critical areas that the U.S. DoD needs them desperately and we've been talking about. So P550, more Switchblade, more One-Way Attack, more Counter-UAS, more Directed Energy, ***more SCAR and BADGERS. And those are the key areas that we expect more of in our second half of the year***.

***The Truth Begins to Emerge as the Individual Defendants Nonetheless Continue to Issue False and Misleading Statements to Stockholders***

73. The truth began to emerge on January 20, 2026, when the Individual Defendants caused the Company to file a Current Report on SEC Form 8-K (the "January 2026 8-K"), which announced that on January 16, 2026, upon mutual agreement, "the U.S. Government issued a stop work order on the Company's . . . Agreement for the delivery of BADGER phased array antenna systems to support the [SCAR] program." On this news, the price of the Company's stock fell $61.97 per share, or approximately 16%, from a closing price of $392.86 on January 16, 2026, to close at $330.89 per share on January 20, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

74. For example, in the January 2026 8-K, the Individual Defendants stated that the "stop work order allows for the parties to negotiate an amended agreement for the future of the SCAR program under new requirements for the program," which was "expected to be a firm-fixed price agreement." Further, in the January 2026 8-K, the Individual Defendants noted that the "Company expects to continue to deliver capabilities and products for the SCAR program." These statements were materially false and misleading, as the Individual Defendants failed to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program

and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated.

75. The truth continued to emerge when, on March 2, 2026, *Space News* reported that the U.S. Space Force was "reassessing how to move forward" with the SCAR program and was opening the SCAR program to different suppliers than AeroVironment. Colonel Stevens, the director of contracting at the U.S. Space Force's RCO, who supervised SCAR, was quoted in the *Space News* report as stating "We have been in conversations with the SAE [senior acquisition executive] ***for a little while now***, and we are going to move into a new acquisition strategy for SCAR."

76. Additionally, Colonel Stevens stated "[t]hat new acquisition strategy will likely take the form of ***other companies building versions or variants of SCAR***," and that the U.S. Space Force "will most likely introduce other vendors into the mix," thus signaling the U.S. Space Force's decision to work with more than one contractor. On this news, the price of the Company's stock fell $43.93 per share, or more than 17%, from a closing price of $252.25 on February 27, 2026, to close at $208.32 per share on March 2, 2026.

77. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

78. For example, on March 2, 2026, defendant McDonnell participated in a fireside chat at the Citizens Technology Conference (the "Citizens Conference"). During the Citizens Conference, defendant McDonnell was asked about the SCAR program and the *Space News* report released earlier that day, to which defendant McDonnell responded, in relevant part:

> [W]e have a fixed price and a set delivery schedule and all the things that comes with that, and that's the process we're in now of negotiating that go-forward contract.

***

We didn't cancel the contract. We're still on the program. We still have a contract.

79. Moreover, in response to the news that the Space Force was soliciting proposals from other vendors, defendant McDonnell claimed that "we're multiple years ahead of any particular competitors in the market. So, it's a little bit of a game of them trying to make us go faster, I think."

80. Further, on March 3, 2026, the Individual Defendants caused the Company to issueda press release titled "AV Issues Statement Regarding Active Negotiations for Contract Amendment to Support U.S. Space Force's SCAR Program" (the "March 2026 Press Release"). The March 2026 Press Release addressed the purported ongoing negotiations for the SCAR program with the U.S. Space Force, stating, in relevant part:

> ***We remain in active negotiations with the U.S. Space Force regarding AV's contract to deliver ground stations to support the SCAR program.*** AV appreciates that ***the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline.*** AV is focused on aligning to customer needs and, as separately announced, is actively investing in expanding manufacturing capacity in Albuquerque, New Mexico to support growth in our Space and Directed Energy platforms, including manufacturing for the SCAR program. AV's innovation and ability to scale ahead of manufacturing remains a key differentiator, giving us a competitive edge in the broader defense market. ***AV is confident in its ability to successfully deliver our systems ahead of competitors.***

81. The truth continued to emerge on March 10, 2026, when the Individual Defendants caused the Company to issue an earnings press release (the "3Q 2026 Earnings Release"). The 3Q 2026 Earnings Release reported a third-quarter FY 2026 operating loss of $179 million, compared to an operating loss of $3.1 million for the third quarter of fiscal year 2025 ("FY 2025"). The 3Q 2026 Earnings Release noted that the "decrease year-over-year was primarily due to the goodwill impairment of $151.3 million" in AeroVironment's space division after the stop work order related

to the U.S. Space Force's SCAR program. Further, the 3Q 2026 Earnings Release provided an updated outlook for FY 2026, announcing that "the Company now expects a revenue of between $1.85 billion and $1.95 billion," compared to the previous FY 2026 guidance range of $1.95 billion to $2.0 billion.

82. On this news, the price of the Company' stock fell $13.84 per share, or more than 6%, from a closing price of $221.57 on March 10, 2026, to close at $207.73 per share on March 11, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

83. For example, that same day (March 10, 2026), during an earnings conference call with analysts and stockholders, despite revealing that the U.S. Space Force terminated the $1.7 billion contract with the Company, defendant Nawabi claimed that AeroVironment "remain[s] in active discussions with the U.S. Space Force regarding . . . BADGER," stating, in relevant part:

> We remain in active discussions with the U.S. Space Force regarding the BADGER phased array antenna system to support the SCAR or Satellite Communication Augmentation Resource program. We appreciate that the contract was temporarily paused while we work together on a firm fixed price contract that provides a commercialized product solution*. **As of this morning, we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work. Therefore, the U.S. Space Force has concluded to terminate our existing contract for convenience, pay us for our allowable incurred cost with a fee and enable AV to recompete for the program*** with their revised requirements and our proposed solution.

84. Later, during that same call, defendant McDonnell addressed the connection between the SCAR stop work order and the Company's updated, lower FY 2026 guidance, stating, in pertinent part:

> ***The well-publicized stop work order for the SCAR program did have a negative impact on the quarter and this is in part the reason we are lowering our full-year guidance. This resulted in a noncash $151 million goodwill impairment*** as the evaluation of the acquired asset, the space business, ***was triggered by the SCAR stop-work order.*** The reevaluation resulted in a reduction in the acquisition date

> value of the acquired space business of approximately 17%. ***We do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience.***

85. During that same call, defendant McDonnell also detailed the impact that the termination of the SCAR program contract would have on the Company's financial results, stating, in relevant part:

> We ended the quarter with $1.1 billion of funded backlog and approximately $3 billion of unfunded backlog***. I should note that approximately $1.5 billion of the unfunded backlog relates to the SCAR program*** for which we were under contract at the end of the quarter. ***We expect an adjustment to the unfunded backlog as a result of the intent of the customer to terminate*** for convenience and the resolution of the customer's obligations under the current contract.

86. Additionally, on March 11, 2026, the Individual Defendants caused the Company to file its Quarterly Report on Form 10-Q with the SEC for the third quarter of FY 2026 (the "3Q 2026 10-Q"). The 3Q 2026 10-Q was signed by defendants Nawabi and McDonnell and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Nawabi and McDonnell attesting to the accuracy of the 3Q 2026 10-Q and stating that "as of January 31, 2026, the end of the period covered by this Quarterly Report on Form 10-Q, ***our disclosure controls and procedures were effective and were operating at a reasonable assurance level***."

87. The 3Q 2026 10-Q provided that the goodwill impairment for the third quarter was $151.3 million, and that AeroVironment's goodwill balance on January 31, 2026, was $2.46 billion.

***The Truth Finally and Fully Emerges***

88. The truth fully emerged on June 22, 2026, when the Company announced in a Current Report on SEC Form 8-K that AeroVironment's financial statements filed in the 3Q 2026 10-Q "require restatement and should no longer be relied upon" because the goodwill impairment

calculation was grossly understated.

89. Further, the Individual Defendants reported that the impairment charge had been understated by $89.4 million, thus bringing the correct goodwill impairment total charge to $240.7 million. The Individual Defendants attributed this to "an error in the calculation of the carrying value used in the goodwill impairment analysis of the Space reporting unit."

90. The Individual Defendants also disclosed that the error and the related restatements were the result of a newly identified material weakness in the Company's internal control over financial reporting," and that "the disclosure controls and procedures as of January 31, 2026 were ineffective."

91. On this news, the price of the Company's stock fell $18.28 per share, or nearly 11%, from a closing price of $169.61 on June 18, 2026, to close at $151.33 per share on June 22, 2026.

***Insider Selling***

92. During the Relevant Period, the Individual Defendants knew that the public statements they made about the SCAR contract were materially false and misleading. Armed with this knowledge, certain of the Individual Defendants -- Nawabi, McDonnell, and Page – took advantage, selling personally-held shares of Company stock at artificially high prices.

93. Specifically, on July 16, 2025, defendant Nawabi sold 17,300 shares of Company common stock for proceeds of over $4.5 million. Defendant McDonnell sold $1.4 million worth of stock between October 10, 2025 and March 10, 2026. And defendant Page sold $835,477 in Company common stock between January 15, 2026 and June 15, 2026.

94. All told, defendants Nawabi, McDonnell, and Page sold approximately ***$6.8 million*** worth of stock Company during the Relevant Period, when they had access to information showing

that the SCAR contract was at risk from competition, and the public did not.

## DAMAGES TO THE COMPANY

95. As a direct and proximate result of the Individual Defendants' conduct, AeroVironment will lose and expend many millions of dollars.

96. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

97. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

99. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, as well as proceeds obtained through improper lucrative insider trading conducted by certain of the Individual Defendants.

100. As a direct and proximate result of the Individual Defendants' conduct, AeroVironment has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

101. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

102. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described above, for which they were compensated for.

103. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104. Plaintiff brings this action derivatively in the right and for the benefit of AeroVironment to redress the Individual Defendants' breaches of fiduciary duties.

105. Plaintiff will adequately and fairly represent the interests of AeroVironment and its shareholders in enforcing and prosecuting its rights.

106. AeroVironment is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

108. A pre-suit demand on the Board of AeroVironment is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following ten (10) individuals: defendants Nawabi, Burbage, Davidson, Lewis, Long, Muller, Page, and Votel (the "Director Defendants"), and non-parties William J. Lynn III and Michael D. Ruppert. Plaintiff needs only to allege demand futility as to five of the ten AeroVironment directors that were on the Board at the time of the filing of this complaint.

109. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

110. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls.

111. The Director Defendants all face a substantial likelihood of liability for their actions in issuing the false and misleading 2025 Proxy Statement. The 2025 Proxy Statement called for a stockholder vote to approve the Restated 2021 Plan, which increased the amount of shares available under the 2021 Plan by 1,200,000 shares. The misrepresentations and omissions set forth herein were material to stockholders in voting to approve the Restated 2021 Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. Prior to the Company's 2025 Annual Meeting of Stockholders on September 25, 2025, there were

621,582 shares available for distribution under the 2021 Plan. After stockholders voted to approve the Restated 2021 Plan, there were an additional 1,200,000 shares available for issuance under the Restated 2021 Plan. Thus, the Individual Defendants received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and stockholders approving the Restated 2021 Plan. For these reasons too, demand on the Director Defendants in futile and, therefore, excused.

112. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

113. Defendants Davidson, Lewis, Muller, and Page (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

114. Defendant Nawabi is not independent for purposes of demand futility because his principal occupation is serving as President and CEO of AeroVironment. Accordingly, his livelihood is dependent on and completely intertwined with the other Director Defendants, and the Board has admitted in the Company's most recent proxy statement that he is not an independent director. In addition, defendant Nawabi is a defendant in the Securities Action based on his false and misleading statements described herein. For these reasons, defendant Nawabi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115. Moreover, defendants Nawabi and Page are directly interested in a demand based on their challenged stock sales executed during the Relevant Period while they, but not stockholders, possessed material, adverse, non-public information.

116. AeroVironment has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for AeroVironment any part of the damages AeroVironment suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

117. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Demand Board either face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

118. The acts complained of herein constitute violations of fiduciary duties owed by AeroVironment's officers and directors, and these acts are incapable of ratification.

119. Thus, for all of the reasons set forth above, the eight Director Defendants, and, if not all of them, at least five members of the Demand Board, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

120. Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

121. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

122. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

123. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CLAIM

### Against Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger for Violations of Section 14(a) of the Exchange Act

126. Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

127. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

128. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

129. Under the direction and watch of defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such

waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

130. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

131. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors and the approval of the Restated 2021 Plan.

132. As a result of defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger causing the 2025 Proxy statement to be false and misleading, at the 2025 Annual Meeting of Stockholders, the Company's stockholders voted, *inter alia*, to approve the Restated 2021 Plan, and to re-elect defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, thereby allowing them to continue breaching their fiduciary duties to the Company.

133. The Company was damaged as a result of Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger's material misrepresentations and omissions in the 2025 Proxy Statement.

134. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants Nawabi, McDonnell, and Clum for Contribution Under Sections 10(b) and 21D of the Exchange Act

135. Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

136. AeroVironment and defendants Nawabi, McDonnell, and Clum (the "Officer Defendants") have all been named as defendants in the Securities Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers of AeroVironment.

137. The Officer Defendants, because of their positions of control and authority as officers of AeroVironment, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of AeroVironment, including the wrongful acts complained of herein and in the Securities Action.

138. Accordingly, the Officer Defendants are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

139. As such, AeroVironment is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

**FOURTH CLAIM**

**Against Individual Defendants for Unjust Enrichment**

140. Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

141. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

142. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

143. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

144. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

**FIFTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

145. Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

146. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

147. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions.

148. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

149. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of AeroVironment and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants breached their fiduciary duties, waste of corporate assets, unjust enrichment, and aiding and abetting;

C. Determining and awarding to AeroVironment the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest;

D. Directing AeroVironment and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AeroVironment and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

i. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

ii. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E. Awarding AeroVironment restitution from the Individual Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 15, 2026

Respectfully submitted,

**BUTLER CURWOOD**

/s/ *Paul M. Falabella*
Zev Antell (VSB No. 74634)
Paul M. Falabella (VSB. No. 81199)
140 Virginia Street, Suite 302
Richmond, VA 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
zev@butlercurwood.com
paul@butlercurwood.com

OF COUNSEL:

**SHUMAN, GLENN & STECKER**

Brett D. Stecker (*pro hac vice* to be filed)
300 Countryview Drive
Bryn Mawr, PA 19010
(303) 861-3003
brett@shumanlawfirm.com